We will call the next case of Arrowpoint Capital Corporation v. Arrowpoint Asset Management, LLC, et al. Ms. Anderson? Yes, Your Honor. Your Honors, I'm Corby Anderson, and along with my colleagues Matt D'Antonio and Michael Arrington, I'm here on behalf of the appellant, Arrowpoint Capital. I'd like to reserve four minutes for rebuttal. That's fair. And because of all the Arrowpoints involved here, I'd like to try to refer to my client as capital and to Mr. Prutzman's client as asset. I'm sure I'll slip up. That would be helpful. But that's my goal. My notes are in terms of AC and AAM. So, yes. Well, there are three points I'd like to make today. First, all types of confusion are entitled to equal protection under the Lanham Act, customer confusion and non-customer confusion. Yet they were not treated that way in the district court. The second point I'd like to make is that capital's trademark registrations for insurance-related activity alone are sufficient to support the entry of a preliminary injunction against... both forms of confusion the same way. Because my recollection of the text of the opinion at least is that the district court at least referred to and recognized that supplier confusion could be a basis, an appropriate basis here for meeting the test for infringement. Yes, Your Honor. And the court in a footnote did recite the law accurately that non-customer confusion is entitled to protection. But when you look at the way the court applied the law to the facts, it's clear that the court really discounted any confusion that wasn't customer confusion. Why should non-customer confusion matter as a matter of what the trademark law is designed to do? Isn't it harm as distinguished from confusion that's the issue? And can you show, did you put in any evidence of harm to AC? Yes, Your Honor, we certainly did. The harms include loss of control of AeroPoint Capital's reputation, loss of trades, even the compromising of its financial information, disparagement. Those things were things that the district court said were embodied in self-interested affidavits. And your opponents make much of the point that the district court understood the standard to apply as you acknowledged in response to Judge Smith's question. But that it chose to give reduced attention or weight to the affidavits which your own people produced. So, can you please respond to what's wrong with the district court saying, I'm just not impressed with your own people coming forward. I'm not giving that a lot of weight. There's several things, Your Honor, that are wrong with that. First of all, if the court is going to make credibility determinations, then it should hold a hearing. Did you ask for a hearing? Were you denied a hearing? We asked when we completed the briefing. We asked for oral argument. I'm sorry, not oral argument. Yes, we asked for argument. Did you ask for an evidentiary hearing? Well, Your Honor, yes. May I just ask you this as a predicate? Do you agree that the rules of evidence are not strictly applied when you are in a PI proceeding? Absolutely, Your Honor. And that's well established in the Coase decision, for example. Why isn't Judge Jordan's question right on point here? That the district court's discounting of the affidavits as being worthy of little weight, I would infer that that's the import of his declaration, is inherently a function of a district judge sitting as a fact finder in a PI proceeding. Several things, Your Honor. First of all, both sides submitted the same kind of evidence, yet only Arrowpoint Capital's affidavits were considered of little weight. Every affidavit that Arrowpoint Asset submitted was given full weight. Secondly, our affidavits included... When you say it was given full weight, the district court really didn't address those, right? The district court was looking at your affidavits. So you're asking us to infer that because the district court didn't say something about Arrow, about AAC's assets, affidavits... Capital and asset, right? I'm trying. Didn't say something about assets, affidavits, that he gave them somehow more weight. But that's an inference you're asking us to draw. It's not in the opinion, is it? Well, the opinion makes several points that are based on affidavits submitted by asset, absolutely. But another point that I need to make here is that Capital's affidavits were not just self-serving statements by Capital's employees. They included, for example, correspondence. When a Capital affidavit would say, here's an instance of confusion, an attachment to the affidavit would be the email exchange with the trader who had been confused. We understand you don't agree with the district court's view of how to weigh that evidence, but as a legal matter, you're not suggesting, are you, that the district court can't look at the affidavits and make some judgments about how much weight to give them, are you? I'm saying that if the district court is going to weigh the credibility of this evidence, it should hold a hearing. When you say should, are you saying it's required to hold a hearing? Coase says just that, that if there are going to be credibility determinations made, the judge should hold a hearing. And in response to your question, Judge Smith, we did orally ask the court for a hearing. For an evidentiary hearing? Yes, and at a very early stage. And the response that we got, this was in January of 2011, was you will never get a hearing from me. Now, that was not transcribed, but there is a minute entry of the teleconference, and because you asked me directly, I tell you that. That was the response that we got. So let me make sure I understand this. Is there something of record that we can look at? Because what you've just described to us is something not of record, which we can't look at. Is there anything of record that shows you asked for a hearing? No, Your Honor, there is not. So there's nothing of record that you persisted in asking for a hearing or that you did so in any subsequent proceeding like oral? Yes, Your Honor. I'm sorry to interrupt you. I apologize. I just about said strike that for thinking I'm still back in the district court. Did you have anything in the nature of oral argument, yet short of an evidentiary hearing? No, Your Honor, we asked for it. Everything was on the papers with respect to the presentation and submission of evidence in support of the PI that you sought. Exactly. You're entitled to a jury, are you not, in trademark cases? Yes, we are. Did you ask for a jury? Yes, we did. But we're entitled to a hearing on our motion for injunctive relief. And we waited three years and two months. Well, you wouldn't get a jury on an injunctive relief request unless there's an issue of fact.  I'm just saying that we were entitled to have a timely consideration of our motion. Let me ask you this, Ms. Anderson. The district court said I don't have a way of knowing whether what you put in front of me are just idiosyncratic, isolated instances of confusion because you haven't given me sales volume information from which I can make that judgment. You, in one of your briefs, say, oh, we did. But then you cite something that's in appendix page 2,100-something-or-other-something-or-other. It looks like it's buried deep in the appendices. Did you in any way flag for the district court or point to the district court, look, I've given you these nine instances of confusion, and they're meaningful in the context of this sales volume. Here's how you can address that. Did you share information with the district court or point the district court to that kind of sales volume information? In our briefing to the district court, we mentioned the number of trades. And we certainly, and this is another point that I'd like to make, you mentioned the nine instances of confusion. We had actually 11 by the time our motion was briefed. And then twice we moved to supplement the record with 16 additional instances of confusion. Stick with me. We can get to the motions to supplement. But my question to you is, the district court's assertion in its opinion was, you didn't give me a basis to understand how these instances stacked up in terms of the meaningfulness in the context of the volume of sales. And I want you to respond to that. Was the district court on sound ground? I mean, is it a fair criticism of what you did? No, Your Honor, because in our briefing we did mention the sales volume. I believe we also mentioned the amount of money earned from that trading activity. I return to my question, which is, isn't the real issue harm? What did you show how you were harmed? How can you be harmed when your customer base is entirely different? People who ask for insurance are just not the people who go in to stockbrokers. Well, Your Honor, I would respectfully submit that that's the consumer confusion lens that you are looking through. And our point is that both of these... No, I'm looking through the lens of you and your opponent. Well... You have different consumer groups, right? As I understand it, your suggestion in response to Judge Slover's question is that might be a relevant inquiry if we were talking about consumer confusion. But you, on the other hand, and your client are talking about non-consumer. Exactly. And what we are saying is that both of these companies are going after the same deals from the same brokers, and that's where... The same brokers? Yes, Your Honor. Trade... sell insurance that sell stocks? We're talking about the securities. Capital makes its money from its investments. You, in fact, have alleged through submission of some of your evidence that you lost out on some bonds, for example, I think from one or two banks and transactions because of non-consumer confusion. There's confusion on the part of the banking institutions that were marketing to you and others these securities. That's exactly right. And we also suffered reputational harm in this way because this is a competitive market. There are more deals... there are more people after these deals than there are... When you say these deals, you're talking about the securities deals, right? Exactly. If my colleagues will indulge me, I know you're out of time, but on this same line, I would have you respond to one other thing from the defendant's answering brief, Pelley's answering brief. On page 41, it says, the court found, based on the evidence, that the parties target distinct groups of customers, and to the extent that insurance companies and pension funds are potential clients for both, such clients would retain them for different purposes. So first, is it indeed the case that the district court made a finding that the parties target different groups of customers? And second, setting aside customers or non-customers, because I know that's a main point of contention here, is it a fair statement by the appellees that you guys are in different markets? Factually, everybody ought to be able to look at that and say you're operating in a way that nobody could expect your channels to be crossing. Absolutely, I would not agree to that, Your Honor. And here's why. We both provide investment for pension funds. We both provide investment for other insurers. And we run into each other at the same trade conferences, and that has happened more and more. Because you're going into their market. It may be happening, but isn't your client the one who's trying to extend into the market of asset management? No, Your Honor, just the reverse. You were doing that early? As of March 2007, before asset was even formed, we were providing investment services on our own account and for pension funds and insurers. Didn't your client ask somebody to check out the Aramark trademark, right, to see who was using it? You had a trademark search. We did a trademark search. I don't believe that's in the record. There is evidence in the record about assets trademark search in which we appeared, I believe, six times. So we are definitely the senior user. Well, we are five minutes beyond your time. We'll have you back on rebuttal. Thank you, Your Honors. Mr. Putzman. May it please the Court, I'm Donald Putzman, representing the appellant, Arrowpoint Asset Management, and its funds that are also defendants. Mr. Putzman, could we start where we just left off with Ms. Anderson? Let me inquire into the search that your client authorized and that was made and the information derived therefrom. Well, the district court did not weigh that terribly heavily against you as a factor with respect to your intent. I'm sure you think that was a correct determination. What should we make of your client's decision to go forward with use of the mark, notwithstanding what it knew at the time about the holder of a very similar mark and the nature of the business of that holder of the mark? Sure. Well, let's look at what it knew from the trademark search that it did. It knew that Arrowpoint Capital was representing itself to the public solely as a property casualty insurer. That trademark search showed the webpage of Arrowpoint Capital, which portrayed it as solely a property casualty insurance company. Your client is a sophisticated party, though, sir, and in your brief you say investment management services are not a line of business related to insurance, into which AC might reasonably have been expected to expand. But are you telling me that your client didn't know that insurance companies buy and sell large blocks of securities and indeed sometimes do so for other people's account as well as their own? That was news to them? It certainly was news to them that Arrowpoint Capital was holding itself out to the public as being in the investment management business. Is that what your search showed? Absolutely. It showed that it didn't, and in fact Arrowpoint Capital did not put anything on its website about offering investment management services until the fall of 2009. We're not really limited, and the district court wasn't either, to thinking about the website, are we? We're supposed to be looking at a totality of evidence here, and that totality of evidence, well, let me back up and just ask it this way. Sure. On what basis, if any, do you have in the record for saying that investment management services are not a line of business related to insurance, into which AC might reasonably have been expected to expand? You make that statement with citation to nothing in the record, so do you have anything to support that other than your bald assertion? Yes. The record indicates at pages 1383 to 1411 that there are a number of trademark registrations for essentially the same mark or very close marks to separate parties for investment management and for insurance. With all due respect, that doesn't answer my question. So I'll take it that you don't have a basis for that. Let me try again. I feel that that's a basis. If you're picking a trademark and looking at what business you're going to be in, what consumers you're going after, if the same trademarks are registered for insurance and investment management to different people, I submit that that's an indication that the two businesses are not related, the same person. Well, wait just a second. When you say they're not related, they're certainly different, and nobody's contending that they're the same, but part of your argument here and then part of your argument in the district court, which the district court evidently accepted, was who knew? Holy smokes. These are insurance people. These are investment brokers. That's like selling not just apples and oranges, broccoli and oranges. They're completely different. Nobody's ever going to confuse it. Why is it always broccoli that figures into oral arguments? It's a bad vegetable. But in fact, you don't have anything in the record, and some common sense would indicate these are financial services. They're different parts of a financial services industry, but they're both in the financial services industry, right? I think they're in vastly different segments of financial services. Don't forget, this was property casualty insurance, not life insurance. And you keep focusing on customer, customer, customer. Yes. So I would like you to respond, too, to the argument that your opponents make, that you actually led the district court into error, that you acknowledge in your briefing that it's not just customer confusion that matters under the Lanham Act, and yet you briefed to the district court and pointed to the district court until the district court started saying back customer confusion as a basis for decision. Do you want to respond to that? Sure. I don't think that that's a fair criticism. We told the court to follow the Lanham Act, to follow this court's cases, to apply the LAT factors, and I think that the most persuasive case on that point is the Checkpoint Systems case decided by this court where the appellant in that case made essentially the same argument that Arrowpoint Capital makes here, that there was undue focus on lack of evidence of consumer confusion. But you're not arguing, and indeed you acknowledge, that it's not just consumer confusion that matters, right? That other kinds of confusion are relevant and actionable under the Lanham Act, right? With this distinction, what the ultimate question is, is there confusion in the marketplace? All types of confusion have to be taken into account. Sure. But all types of confusion are not entitled to equal weight in the calculus. That's what the Checkpoint decision says. Well, is there anything in the statute that says, if it's not consumer confusion, don't worry about it? I mean, that's just not the law, right? No, the law is you worry about all types of confusion. But if you look at the cases… Well, let's look at what the district court said. The district court started and ended its actual confusion discussion by talking about consumer confusion, and only consumer confusion, right? No, I believe he evaluated the evidence of other confusion. I'm asking you what he said, not what you believe. I'm asking you what he said. He starts and ends by talking about consumer confusion. We can go in and read it, but he said what he said, right? He said one of the factors in his decision was that there was no evidence of actual consumer confusion. Yes, and I submit that that's appropriate. When you say he said one of the factors, let's go ahead and look at what the district court said. Page 13 of the slip opinion. Here the plaintiff produced no evidence of actual consumer confusion. That's how he starts it out. Page 14, winding it up, the record is devoid of any inference of consumer confusion. Now, do you have anything in between where the court says, or even hints, I'm looking at other kinds of confusion? Yes, in the part of his decision that evaluates the actual confusion. That's what I've just read you from. Factor number six. That's what I've just read you from. What's the language you rely on from the actual confusion section that shows that the district court was focused on something other than consumer confusion? I mean, he mentions J.P. Morgan misdirected trades, no evidence that these are significant, especially as they're devoid of the number of trades evidence, and we talked about that with your opponent. But I'm wondering what you can show us that undermines your opponent's assertion that the district court here may have articulated the correct standard but simply failed to apply it. I think he not only articulated it but did apply it. The standard from the checkpoint systems case is that all kinds of confusion have to be taken into account, but actual consumer confusion is the most important. If you look, I think it was summed up in the Champions Golf Club case from the Sixth Circuit best, where they said all types of confusion have to be taken into account and supplier confusion were the principal examples of actual confusion in that case. But the court said the ultimate question is whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated. Doesn't it strike you as, for lack of a better term, odd that the district court would make repeated references to customer or consumer confusion when all the evidence submitted by the plaintiff was evidence of non-consumer confusion? No, it doesn't, because I think he was making the point that was made in the checkpoint systems case that I keep coming back to. If you think he was making that point, Mr. President, why didn't he make the point? Because he never says that, right? What he says is, I have to take into account all kinds of confusion. He took into account the customer confusion evidence, didn't give it much weight because he didn't think it had much value, and then said, and on top of that, there's no evidence of customer confusion. Making customer confusion more important than other types of confusion, I submit, is not wrong. It's what the cases do. Well, I'm a little confused because I thought you had conceded in your briefing that indeed all kinds of confusion are actionable and that the district court didn't err because it understood that. But what you seem to be arguing here is, never mind the fact that the court only talked about customer confusion because your cases say that's okay. So those don't seem to me to be the same argument. Are you acknowledging or not that it would be error for the district court to pay attention just to customer confusion and give no weight to evidence of other kinds of confusion? No. That would be error, right? That would be error, but the court gave it the weight that it found it to be due, and the issue is... But spoke about it in terms of customer confusion. Said the record's devoid of customer confusion. He said the record's devoid of customer confusion, and I submit that that's a relevant observation under the checkpoint case that not all types of confusion are equal. Is it fair for the district court to say, I'm discounting these affidavits because they're not subject to cross-examination, when the district court didn't give a hearing to the applicants for the injunctive relief? Yes, because the court wasn't asked to give a hearing. Well, evidently the court thought there was a problem with the affidavits and they should be discounted because they weren't subject to cross-examination. If the court thought that things should have been subject to cross-examination, wasn't it incumbent upon the court to say, okay, let's have people in and we'll have a hearing? No, I think it's incumbent upon a party to ask for a hearing if they want a hearing, if they're content to submit on the papers and ask for oral argument. That's their choice. Are you suggesting that it has been your view and is your view at this time that the plaintiff was satisfied to proceed on a non-evidentiary basis and not have a PI hearing where witnesses were actually called and evidence produced? Yes, there was never any request on the record for that. In fact, there was a request to have oral argument. Well, let me ask you this. Your opponents point to the Coss decision, which you point to as well, and they say in Coss you, the Third Circuit, were pretty clear about saying if there's a factual dispute, there's supposed to be a hearing. You don't get to just weigh stuff on the affidavits and ignore factual concerns that you might have as a district court. It's incumbent on you to have a hearing. Have they read Coss wrong? Yes, to the extent that the argument is that Coss would require a district court sua sponte to call for a hearing. Well, not sua sponte to call for it in every case, but to call for it in a case where the district court thought, you know what, there are credibility issues here, credibility problems here. I guess what I'm asking you is this. Does our language in Coss mean that if a court like this court, the district court here, says, I'm troubled that these things are not subject to cross-examination, that's problematic, so I'm discounting the credibility of it. Is that consistent with Coss' instruction that if you've got questions about credibility, you should have a hearing? I think it's consistent with Coss not to have an evidentiary hearing when no party is seeking it. I don't think that's what Jordan has been asking, unless I've misunderstood his question. Irrespective of Coss, although we must consider it, you don't believe that a district judge is a finder of fact in a preliminary injunction. Proceeding is obligated to develop a record which will permit him to make factual determinations that are actual factual determinations and not merely speculative of what evidence might show. I think district courts are regularly guided by what procedure the parties choose. And where the parties choose not to ask for an evidentiary hearing, I don't read anything in Coss or anywhere else that says the district court should insist on holding one. Let me ask you this. The district court said at different places, including in the actual confusion portion, indicated that it was without information it thought it needed. It said, I don't know whether there are misdirected trades or a result of incompetence or actual confusion, et cetera. If the court feels like it's missing information, doesn't that indicate that the court, before making a ruling on an equitable application like this, should say, I need more information, come in and provide it? I think it's up to the parties to make the record and put in what information's there. If something's missing, then it's missing. They'd be cared for and approved. That's your argument. That would be my argument. Okay. And finally, the district court said, I don't have a basis for knowing what the volume of sales and trades here is. And your opponents say, that's just not true. That was in the record. Are they right or are they wrong about that? They are right. There was something in the record. They never called the district court's attention to that. He would have had to search the record and find that. And if he had found it, he would have found three instances of misdirected trades out of, I believe, 2,100 trades during the relevant period. That is one-third of 1% rate in an industry where there's this DK proceeding that corrects for that before anyone gets assigned a trade. When you say corrects for it, they say the DK process doesn't help our reputation. We're suffering reputational harm every time there's a mistake about where these trades are supposed to go. Is that not a fair statement of irreparable harm? Even if things get corrected, you're shown to be incompetent in managing your business if you keep messing around with your trades. I don't think it is. I don't think there's anything in the record other than the party's self-serving speculation that would support that. In fact, Mr. Shumway, the representative of Arrowpoint Capitals, said, I believe, in an email, DKs are not uncommon. Thank you very much. Your Honors, I'd like to address several things here. First of all, regarding the information on trades, it's an exhibit to our reply brief in the court below. To me, that does not seem hidden. It does not seem what? Hidden. Hidden. That it's hidden in the record. With regard to whether assets... No, I think what Judge Jordan was asking was whether it was called to the district court's attention. Yes, Your Honor. And I think that including it in your reply brief, as an exhibit to your reply brief, should constitute calling it to the court's attention. Well, you never, in any paper, said, and here are the volume of trades. You didn't point it out that way, right? We referenced it in the brief, and then it was the exhibit that gave the exact information. You referenced it how? That's the question I was asking during your initial argument. And now you've said we've attached something to the reply brief, and I'm asking you, since I did not read your district court briefing, did you say in any brief in front of the district court judge, these are the volume of trades that we had, to put in context the number of instances of confusion that we're telling you? I can't stand here today and represent to you that that's exactly what we said, but I believe that's why we... I'm not asking you for a word for word. I'm just asking you to tell me whether or not you did something like that. If you didn't, that's fine. It's one thing to say it's in there someplace. It's another thing to point it out to the court. I'm just asking whether you ever pointed it out to the court. Yes, Your Honor, and I believe we did, but I don't want to overstate because I'm just not positive. Do you believe you quantified it in some way? Yes, Your Honor. For the purposes of the district court. Yes, Your Honor. Now, with respect to whether Asset knew that insurance and investment were going to cross paths, I'd like to point out, first of all, that Mr. Corkins managed investments for insurers. He had done that before he ever formed AeroPoint Asset, and the whole issue of whether our website referred to our investment activities for others, Mr. Corkins himself testified during his deposition that we don't advertise for the kind of trades that we do. We don't advertise the way that people traditionally, that other businesses would. Right. You're not reaching out to the general consumer market. Understood. That's exactly right. Now, as far as the confusion and whether non-consumer confusion was disregarded, I'd like to point out that in only one of the 10 LAP factors did the court ever address non-consumer confusion. And that was... And you think the court should have done that more often? Absolutely. And this court has held that in certain situations you adapt the LAP factors according to the circumstance. For example, with FISNs, they were adapted for reverse confusion. How about addressing, if you would, Mr. Putzman's argument that our own cases, and he emphasized checkpoints a few times, do direct attention, particularly to consumer confusion, so it wasn't a problem for the district court to do that. It's what our case law actually encourages. What's your response? My response is that that is flatly an incorrect statement of the law. The language of the Lanham Act was amended to remove the specific reference to consumer confusion and provide, and this court's subsequent decisions have provided, that all kinds of confusion are protected. And that's what the court didn't acknowledge. And one last point in terms of the self-serving affidavits. I would point out that some of what the court considered unreliable included a statement that we found in discovery from Asset's own trader saying when one of these instances of confusion occurred with a broker, oh, AeroPoint Capital, that's just some stupid company with our same name. I submit that that is not unreliable evidence of confusion. When did your client begin promoting and advertising its investment management services to the public? Well, Your Honor, I wouldn't say that Capital promoted to the public in the sense that you traditionally would. I would say that Capital went after business and made presentations by March 2007 as our trademark application states. And that's one thing I would point out in the record, that the brief refers to this as an intent to use application. It was not that at all. It states first use of March 2007. Well, why did your client wait until September 28, 2009 to file a trademark application for investment management services? I wasn't involved in filing it, but I've spoken with – That's not the client. I know. I'm talking about your client. I know. And what I'm telling you is that although I don't have firsthand knowledge of that decision, I spoke with my client about it, and I believe it was simply inadvertence. And then once we were – once this dispute arose, we as a belt and suspenders kind of move decided to file for that. But the use has been there since March of 2007. And one thing that we didn't mention is that registrations aside, under common law, because we've been using since March 2007, we also have enforceable rights in the mark. Thank you very much, Ms. Anderson. President, thank you for your helpful audience. Thank you, Your Honors. We'll take the case under advisement, and I will ask the clerk to proceed. Please rise. This court stands adjourned until March 30th at 12 p.m.